# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANCISCO SALDANA,

        Plaintiff

   v.

UNITED STATES OF AMERICA, *et al.*,

        Defendants

:
:
:
:
:
:
:
:
:
:
:

Civil No. 3:16-cv-634

(Judge Mariani)

## MEMORANDUM

Plaintiff, Francisco Saldana, an inmate formerly confined at the Canaan United States Penitentiary in Waymart, Pennsylvania ("USP-Canaan"), initiated this action pursuant to *Bivens*[1], 28 U.S.C. § 1331, and the Federal Tort Claims Act ("FTCA")[2]. (Doc. 1). Named as Defendants are the United States of America, Dr. Walter Dobushak, Milton Washington, and Joseph Fuga. The complaint raises deliberate indifference and negligence claims against Defendants. Presently ripe for disposition is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 20). For the reasons set forth below, the Court will grant Defendants' motion.

---

[1]   *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

[2]   The Federal Tort Claims Act ("FTCA") allows plaintiffs to seek damages from the United States for certain torts committed by federal employees. 28 U.S.C. §§ 1346(b), 2674.

## I.    Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the

non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am.,*

*Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## II.    Statement of Undisputed Facts[3]

Saldana is a federal inmate who is currently incarcerated at the United States

Medical Center for Federal Prisoners in Springfield, Missouri. (Doc. 27, Statement of

---

[3]    To the extent Defendants' statement of material facts are undisputed or supported by
uncontroverted record evidence, the Court cites directly to the statement of material facts and supporting
evidence. (Doc. 27).

Material Facts ("SMF"), ¶ 1; Doc. 27-1, pp. 3-4, Declaration of Michael FiggsGanter, ¶ 3;

Doc. 48, Counter Statement of Material Facts). At all relevant times, Saldana was housed

at USP-Canaan. (SMF ¶ 2; Doc. 48, Counter Statement of Material Facts).

## A. Facts Related to the Medical Care Provided to Saldana

Dr. Dobushak was formerly employed by the Federal Bureau of Prisons ("BOP") as

the Clinical Director for USP-Canaan. (SMF ¶ 3; Doc. 27-1, pp. 43-47, Declaration of Dr.

Walter Dobushak ("Dobushak Decl."), ¶ 1). Saldana alleges that the lack of treatment

began in May 2013 until his transfer to the Medical Center for Prisoners. (SMF ¶ 5;

Dobushak Decl. ¶ 3).

The parties dispute whether Dr. Dobushak examined Saldana on May 17, 2013.

(SMF ¶ 6; Doc. 48, ¶ B(1)). A Clinical Encounter note dated May 17, 2013, indicates that

Dr. Dobushak examined Saldana and noted that Saldana's diabetes was "grossly

uncontrolled." (SMF ¶ 6; Dobushak Decl. ¶ 4; Doc. 27-1, pp. 160-64, Clinical Encounter

dated May 17, 2013). Dr. Dobushak noted that Saldana was not taking his insulin as

prescribed. (SMF ¶ 7; Dobushak Decl. ¶ 4; Doc. 27-1, p. 160). The parties dispute whether

Saldana's diabetes and insulin levels were monitored until he was transferred to the

Springfield Medical Center. (SMF ¶ 8; Dobushak Decl. ¶ 4; Doc. 27-1, pp. 48-171; Doc. 48

¶ B(3)).

The parties dispute when Saldana's right foot was first evaluated at USP-Canaan's

4

Health Services Department ("HSD"). (SMF ¶ 9; Doc. 48, ¶ B(4)). Defendants assert that Saldana's right foot was first evaluated on September 13, 2013. (SMF ¶ 9; Dobushak Decl. ¶ 4; Doc. 27-1, p. 147). Saldana asserts that his right foot was evaluated on May 14, 2014. (Doc. 48, ¶ B(4)).

Saldana's diabetes and administration of his insulin continued to be monitored very closely by the medical staff at USP-Canaan. (SMF ¶ 10; Dobushak Decl. ¶ 6; Doc. 27-1, pp. 48-171). On March 21, 2014, Saldana's insulin level was increased and additional testing was ordered to evaluate his overall condition. (SMF ¶ 11; Dobushak Decl. ¶ 6; Doc. 27-1, pp. 135-39).

On April 11, 2014, Saldana was again seen by the HSD at USP-Canaan and it was noted that his condition had improved. (SMF ¶ 12; Dobushak Decl. ¶ 6; Doc. 27-1, pp. 130-32). At his evaluation on April 11, 2014, it was noted that Saldana's A1C level had decreased, he reported that he was feeling much better, and agreed to continue his new diet and exercise plan. (SMF ¶ 13; Dobushak Decl. ¶ 6; Doc. 27-1, p. 130).

On May 14, 2014, Saldana was seen in the HSD for a right foot wound. (SMF ¶ 14; Dobushak Decl. ¶ 7; Doc. 27-1, pp. 126-28). At the evaluation on May 14, 2014, Saldana disclosed that he had sustained the foot injury two days prior. (SMF ¶ 15; Dobushak Decl. ¶ 7; Doc. 27-1, p. 126). On May 14, 2014, Saldana's right foot wound was examined, cleaned, and sterilized. (SMF ¶ 16; Dobushak Decl. ¶ 7; Doc. 27-1, pp. 126-128). On May

5

14, 2014, Saldana was provided a prescription for Cephalexin, an antibiotic, and directed to follow up with the HSD if his condition worsened. (SMF ¶ 17; Dobushak Decl. ¶ 7; Doc. 27-1, pp. 126-28).

On June 3, 2014, Saldana reported to the HSD to receive wound care. (SMF ¶ 18; Dobushak Decl. ¶ 8; Doc. 27-1, p. 123). During the examination on June 3, 2014, it was noted that Saldana had an open ulceration to the bottom of his right foot. (SMF ¶ 19; Dobushak Decl. ¶ 8; Doc. 27-1, p. 123). Saldana's open ulceration to the bottom of his right foot was cleaned, sterilized, and appropriately dressed. (SMF ¶ 20; Dobushak Decl. ¶ 8; Doc. 27-1, p. 123). On June 3, 2014, the HSD ordered a consult with podiatry. (SMF ¶ 21; Dobushak Decl. ¶ 8; Doc. 27-1, p. 123).

Saldana was first treated by podiatry at USP-Canaan on June 5, 2014. (SMF ¶ 22; Dobushak Decl. ¶ 9; Doc. 27-1, p. 120). At the June 5, 2014 podiatry appointment, Saldana was provided a prescription for Levofloxacin, an oral antibiotic, ointment to apply to the wound, and further testing was ordered. (SMF ¶ 23; Dobushak Decl. ¶ 9; Doc. 27-1, p. 120).

On June 8, 2014, Saldana's condition worsened and he was transferred to Wayne Memorial hospital for further evaluation and treatment. (SMF ¶ 24; Dobushak Decl. ¶ 10; Doc. 27-1, p. 118). The parties dispute whether Saldana was evaluated by Wayne Memorial hospital staff. (SMF ¶¶ 26, 27; Doc. 48 ¶¶ B(5)(6)). Defendants contend that the

6

Emergency Department at Wayne Memorial hospital evaluated Saldana, found no new issues, and did not issue any new orders for medical treatment for Saldana. (SMF ¶¶ 26, 27; Dobushak Decl. ¶ 11; Doc. 27-1, pp. 112-15). Saldana contends that he was advised that "nothing is wrong with you." (Doc. 48, ¶¶ B(5)(6)).

On June 9, 2014, upon return to USP-Canaan, Saldana was evaluated at the HSD. (SMF ¶ 25; Dobushak Decl. ¶ 11; Doc. 27-1, pp. 112-15).

On June 13, 2014, Saldana was examined in the HSD and the dressing on his wound was changed. (SMF ¶ 28; Dobushak Decl. ¶ 12; Doc. 27-1, pp. 108-110). On June 13, 2014, the HSD received results of Saldana's medical tests from Wayne Memorial hospital that were positive for Staph Haemolyticus. (SMF ¶ 29; Dobushak Decl. ¶ 12; Doc. 27-1, p. 108). Saldana was directed to report back to the HSD daily to have the dressings on his wound changed. (SMF ¶ 30; Dobushak Decl. ¶ 12; Doc. 27-1, p. 109).

On June 17, 2014, because Saldana's condition began to worsen, he was again transferred to Wayne Memorial hospital. (SMF ¶ 31; Dobushak Decl. ¶ 13; Doc. 27-1, pp. 100-101). On June 21, 2014, Wayne Memorial hospital informed the HSD at USP-Canaan that Saldana was provided intravenous antibiotics. (SMF ¶ 32; Dobushak Decl. ¶ 13; Doc. 27-1, p. 95). Also un June 21, 2014, Wayne Memorial hospital further advised the HSD that Saldana's wound was improving. (SMF ¶ 33; Dobushak Decl. ¶ 13; Doc. 27-1, p. 95). Saldana was expected to be discharged from Wayne Memorial hospital on June 23, 2014.

7

(SMF ¶ 34; Dobushak Decl. ¶ 14; Doc. 27-1, p. 95).

After Saldana returned to USP-Canaan he was evaluated by the HSD on June 23, 2014; June 25, 2014; June 26, 2014; June 27, 2014; July 3, 2014; July 17, 2014; July 18, 2014; July 28, 2014; and July 29, 2014. (SMF ¶ 35; Dobushak Decl. ¶ 15; Doc. 27-1, pp. 67-93). Saldana received dressing changes daily, wound care follow-up, and consultations with the podiatry clinic to treat the wound on his right foot. (SMF ¶ 36; Dobushak Decl. ¶ 15; Doc. 27-1, pp. 67-93).

On July 28, 2014, Saldana was evaluated at the HSD and additional wound care consultation was ordered. (SMF ¶ 37; Dobushak Decl. ¶ 16; Doc. 27-1, p. 75). On July 28, 2014, a note was placed in Saldana's electronic medical record that he had poorly controlled his Type II diabetes and developed a non-healing persistent diabetic foot ulcer on his right foot. (SMF ¶ 38; Dobushak Decl. ¶ 16; Doc. 27-1, p. 75). On July 28, 2014, it was further noted that Saldana had been regularly treated in podiatry at USP-Canaan since the development of the foot ulcer. (SMF ¶ 39; Dobushak Decl. ¶ 16; Doc. 27-1, p. 75). Saldana also underwent numerous debridement's in the area of the wound, and was prescribed medication to treat the wound. (SMF ¶ 40; Dobushak Decl. ¶ 16; Doc. 27-1, p. 75). Saldana was prescribed several antibiotics to treat the wound; specifically, Rocephin, Levaquin, Clindamyon, and Keflex. (SMF ¶ 41; Dobushak Decl. ¶ 16; Doc. 27-1, p. 75).

On July 29, 2014, Saldana was again transferred to Wayne Memorial hospital. (SMF

8

¶ 42; Dobushak Decl. ¶ 17; Doc. 27-1, p. 67). On August 1, 2014, Saldana's fifth metatarsal head was amputated to stem any further deterioration of the wound and spread of the infection. (SMF ¶ 43; Dobushak Decl. ¶ 17; Doc. 27-1, p. 65). Saldana disputes whether his fifth metatarsal head was amputated "to stem any further deterioration of the wound and spread of the infection." (Doc. 48, ¶ B(7)). Saldana remained at Wayne Memorial hospital until his transfer to the Medical Center for Federal Prisoners in Springfield, Missouri. (SMF ¶ 44; Dobushak Decl. ¶ 17; Doc. 27-1, pp. 48-67).

The parties dispute whether Dr. Dobushak administered the appropriate course of medical care to Saldana throughout the development of the ulcer on his right foot. (SMF ¶ 45; Dobushak Decl. ¶ 18; Doc. 27-1, pp. 69-95, 100-116, 120-129, 133, 147-48; Doc. 48 ¶ B(8)). Dr. Dobushak reviewed Saldana's electronic medical record and determined that he was seen, evaluated and treated on a regular basis following the development of the right foot condition. (SMF ¶ 46; Dobushak Decl. ¶ 18; Doc. 27-1, pp. 69-95, 100-116, 120-129, 133, 147-48). The parties dispute whether Saldana was provided a proper course of medical care which included the administration of antibiotics, consultation with a specialist, and care at Wayne Memorial hospital. (SMF ¶ 47; Dobushak Decl. ¶ 18; Doc. 27-1, pp. 48-71, 95-101, 118-119).

The parties dispute the reasoning behind Dr. Dobushak's decision to discontinue medication prescribed by the Wayne Memorial hospital. (SMF ¶ 48; Doc. 48 ¶ B(10)).

9

Dr. Dobushak contends that he determined, based on a clinical decision, that the antibiotic prescribed by the hospital would not be beneficial. (SMF ¶ 48; Dobushak Decl. ¶ 19; Doc. 27-1, pp. 92-93). Upon clinical review, Dr. Dobushak discovered that there was little to no blood flow entering the affected area, which could have a direct impact on the efficiency of systemic antibiotics. (SMF ¶ 49; Dobushak Decl. ¶ 19). Dr. Dobushak discontinued the use of this medication based on his opinion that it would offer no benefit to Saldana and could possibly cause additional symptoms or harm. (SMF ¶ 50; Dobushak Decl. ¶ 19). Saldana contends that there is no evidence to support Dr. Dobushak's subjective assessments, and asserts that his decisions were "non-medical." (Doc. 48 ¶ B(10)(11)(12)(13)). Saldana asserts that twenty-four days after the antibiotic was discontinued, he developed a staph infection. (Doc. 48 ¶ B(13)(14)(15)).

Saldana's condition continued to deteriorate based on the progressive small vessel disease resulting in tissue ischemia as well as his poor management of his Type II diabetes. (SMF ¶ 51; Dobushak Decl. ¶ 20). The parties dispute whether this deterioration resulted in a non-healing right ostemmyelitis of the right foot, which required therapeutic amputation to prevent further spread of the bone infection. (SMF ¶ 52; Dobushak Decl. ¶ 20; Doc. 48 ¶ B(14)). Saldana asserts that the poor management of his diabetes was due to prison policy. (Doc, 48 ¶ B(13)). Saldana states that he had to choose to attend the morning insulin line prior to closing, or attend breakfast prior to closing. (*Id.*). He further states that

the afternoon insulin line was at 3:00 p.m., and dinner was at 6:00 p.m., which caused his sugar level to drop. (*Id.*).

The parties dispute whether Dr. Dobushak's treatment of Saldana, along with any treatment he received by other staff members from the HSD, caused and/or contributed to the clinical progression or outcome of this case. (SMF ¶ 53; Dobushak Decl. ¶ 20; Doc. 48 ¶ B(15)).

The parties dispute whether any attempts were made to treat Saldana's right foot condition. (SMF ¶ 54; Dobushak Decl. ¶ 20; Doc. 48 ¶ B(16)). The parties further dispute whether the spread of the infection into the bone was preventable or caused by treatment Saldana received at HSD. (*Id.*).

## B. Facts Regarding the Injury to Saldana's Right Foot Caused by an Alleged Broken and Collapsed Sidewalk Near the Unit F Housing Walkway at USP-Canaan Maintained by Defendant Washington[4]

Defendant Washington is employed by the BOP as the Environmental and Safety Compliance Administrator at USP-Canaan and has held this position since July 2014. (SMF ¶¶ 55-56; Doc. 27-1, pp. 172-73, Declaration of Milton Washington ("Washington Decl."), ¶¶ 1-2). Defendant Washington is responsible for the planning, direction, and development of all programs related to the safety and environmental health of USP-Canaan. (SMF ¶ 57; Washington Decl. ¶ 3). Defendant Washington is also responsible for developing safety

---

[4] Regarding paragraphs 55–63 and 65, Saldana asserts that he "cannot confirm or deny Defendant's statements." (Doc. 48 ¶¶ B(17)-(25), (27)).

11

and environmental programs at USP-Canaan that comply with Federal BOP requirements. (SMF ¶ 58; Washington Decl, ¶ 3). Defendant Washington conducts monthly inspections of all work areas of USP-Canaan to ensure that the institution is being maintained and operated appropriately. (SMF ¶ 59; Washington Decl. ¶ 4). Defendant Washington understands that security features related to USP-Canaan require it be properly maintained to minimize any potential injuries to inmates and staff members. (SMF ¶ 60; Washington Decl. ¶ 5). Defendant Washington is aware that any defects in the walkways pose a significant threat to the safety and security of inmates and staff members at USP-Canaan. (SMF ¶ 61; Washington Decl. ¶ 5). Defendant Washington investigates reported accidents at USP-Canaan to determine the cause and the need for any remedial measures. (SMF ¶ 62; Washington Decl. ¶ 6).

Defendant Washington receives and maintains all documentation related to any injuries reported at USP-Canaan. (SMF ¶ 63; Washington Decl. ¶ 6).

The parties dispute whether Defendant Washington retains injury reports as statistical data for determining any injury or accident trends at USP-Canaan. (SMF ¶ 64; Washington Decl. ¶ 6; Doc. 48 ¶ B(26)).

Defendant Washington has reviewed the injury report files and was unable to find any complaints submitted by inmates concerning any defects in the walkway near the F Housing unit at USP-Canaan. (SMF ¶ 65; Washington Decl. ¶ 7).

The parties dispute whether Defendant Washington recalls Saldana sustaining or reporting any injury to his right foot as a result of a defect in the walkway near the F Housing unit at USP-Canaan. (SMF ¶ 66; Washington Decl. ¶ 8; Doc. 48 ¶ B(28)). The parties dispute whether Defendant Washington purposefully ignored any defect in the walkways at USP-Canaan. (SMF ¶ 67; Washington Decl. ¶ 9; Doc. 48 ¶ B(29)).

C.    **Facts Regarding Injury to Saldana's Right Foot Caused by an Alleged Broken and Collapsed Sidewalk Near the Unit F Housing Walkway at USP-Canaan Maintained by Defendant Fuga**

Defendant Fuga is employed by the BOP as a Safety Compliance Specialist at USP-Canaan and has held this position since August 2014. (SMF ¶ 69; Doc. 27-1, pp. 174-75, Declaration of Joseph Fuga ("Fuga Decl."), ¶¶ 1-2; Doc. 48 ¶ (B)(30)). The parties dispute whether Defendant Fuga performs and conducts safety and environmental inspections at USP-Canaan to ensure it remains in working order. (SMF ¶ 70; Fuga Decl. ¶ 3; Doc. 48 ¶ (B)(32)). The parties dispute whether any issues discovered by Defendant Fuga at USP-Canaan are documented in his report and submitted to the administrator for corrective action. (SMF ¶ 71; Fuga Decl. ¶ 3; Doc. 48 ¶ (B)(33)).

The parties dispute whether Defendant Fuga reviewed the injury report files and was unable to find any complaints submitted by inmates concerning any defects in the walkway near the F Housing unit at USP-Canaan. (SMF ¶ 72; Fuga Decl. ¶ 5; Doc. 48 ¶ (B)(34)). The parties dispute whether Defendant Fuga recalls Saldana sustaining or reporting any

13

injury occurring to his right foot as a result of a defect in the walkway near the F Housing

unit at USP-Canaan. (SMF ¶ 73; Fuga Decl. ¶ 8' Doc. 48 ¶ (B)(35)). The parties dispute

whether Defendant Fuga purposefully ignored any defect in the walkways at USP-Canaan.

(SMF ¶ 74; Fuga Decl. ¶ 9; Doc. 48 ¶ (B)(36)).

### D. Facts Regarding Saldana's Filing of Administrative Tort Claim Concerning Alleged Injury to his Foot Caused by the Broken or Collapsed Sidewalk at USP-Canaan

The BOP has an administrative tort claim process through which an inmate can seek

compensation from the United States for personal injury, wrongful death, or loss of property.

(SMF ¶ 75; 28 C.F.R. §§ 543.30-543.32, BOP Program Statement 1320.06, Federal Tort

Claims Act). The administrative tort claim process is also outlined in the BOP Program

Statement 1320.06, Federal Tort Claims Act. (SMF ¶ 76).

BOP inmates may file an administrative tort claim pursuant to the Federal Tort

Claims Act with the Regional Office. (SMF ¶ 77; 28 C.F.R. § 543.31(c), BOP Program

Statement 1320.06 at 3). If the claim is denied, the inmate can "request, in writing, that the

Bureau of Prisons reconsider [the] claim in the administrative stage." (SMF ¶ 78; 28 C.F.R.

§ 543.32(g), BOP Program Statement 1320.06 at 7). If the inmate is "dissatisfied with the

final agency action," he may then file suit in federal court. (SMF ¶ 79; 28 C.F.R. §

543.32(g), BOP Program Statement 1320.06 at 7).

On June 29, 2015, Saldana's administrative tort claim, number

14

TRT-NER-2015-04862, was received in the Northeast Regional Office. (SMF ¶ 80; Doc. 2, p. 23, Administrative Tort Claim Receipt Documents). On December 28, 2015, Saldana was notified that his Administrative Tort Claim was denied. (SMF ¶ 81; Doc. 2, pp. 34-35, Denial letter of Administrative Claim Number TRT-NER-2015-04862).

On April 19, 2016, Saldana filed the instant action against the United States of America pursuant to the FTCA. (SMF ¶ 82; Doc. 1). Saldana alleges that the United States through the Safety Department was negligent with the safekeeping and care of USP-Canaan while he was incarcerated there. (SMF ¶ 83; Doc. 2, pp. 14, 15, 16, 20, 22).

### E. Facts Regarding Saldana's Filing of Administrative Tort Claim Concerning the Lack of Medical Treatment to his Alleged Foot Injury while Incarcerated at USP-Canaan

On June 29, 2015, Saldana's administrative tort claim number TRT-NER-2015-04863 was received in the Northeast Regional Office. (SMF ¶ 85; Doc. 2, p. 23, Administrative Tort Claim Receipt Letter). On December 28, 2015, Saldana's Administrative Tort Claim was denied. (SMF ¶ 86; Doc. 2, pp. 34-35, Denial letter of Administrative Claim Number TRT-NER-2015-04863).

On April 19, 2016, Saldana filed the instant action against the United States of America pursuant to the Federal Tort Claims Act. (SMF ¶ 87; Doc. 1).

Saldana alleges ordinary negligence and deliberate indifference on the part of USP-Canaan's Clinical Director because he failed to prescribe antibiotics provided at the local

hospital to treat a diabetic ulcer on his right foot which led to the amputation of his fifth toe. (SMF ¶ 88; Doc. 2, pp. 3, 4, 9, 10, 11).

Saldana also raises negligence and deliberate indifference claims alleging that he initially injured his right foot because Defendants Washington and Fuga failed to monitor and repair defects in the walkways at USP-Canaan. (SMF ¶ 88; Doc. 2, pp. 14, 15, 17, 20).

For relief, Saldana seeks a total amount of $150,000,000. (SMF ¶ 89; Doc. 2, p. 22; Doc. 48 ¶ (B)(37)).

## III. Discussion

Defendants seek an entry of summary judgment on the following grounds: (1) Saldana has not alleged sufficient personal involvement of Defendants Washington and Fuga; (2) Saldana failed to properly exhaust administrative remedies regarding the allegations of deliberate indifference against Defendants Washington and Fuga; (3) Saldana failed to state a claim and the record does not establish deliberate indifference against Defendant Dr. Dobushak; (4) Defendants Washington and Fuga are entitled to qualified immunity; (5) Saldana failed to show that the injury to his right foot was because of the negligence of Defendants Washington and Fuga; and, (6) Saldana failed to set forth an ordinary negligence claim against Defendant Dr. Dobushak that could possibly have been a substantial factor in bringing about his harm. (Doc. 26).

The Court will first address Saldana's objection to the declarations submitted by

16

Defendants Dobushak, Washington, and Fuga in support of their motion for summary judgment. (Doc. 43). The Court will then address Saldana's *Bivens* claim before turning to the FTCA claim.

## A.    Evidentiary Objections by Saldana

As a preliminary matter, the Court considers Saldana's evidentiary objections (Doc. 43) to the declarations of Defendants Dobushak, Washington, and Fuga. Saldana argues that these declarations fail to explicitly state that they are based upon the personal knowledge of the declarants. Saldana also appears to argue that, because these declarations purport to be based on a review of records, either in whole or in part, they are not made on "personal knowledge" and thus may not be properly considered on summary judgment. Saldana further asserts that the declarations are supported by documents and prison records that are inadmissible under Federal Rules of Evidence 803(6) and 902(11). Saldana requests that the Court strike the declarations.

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192

F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial). The "[p]ersonal knowledge [of the matter included in an affidavit] can be based on a review of relevant business files and records." *Del Rosario v. Labor Ready Se., Inc.*, 124 F. Supp. 3d 1300, 1316 (S.D. Fla. 2015) (declining to exclude declaration where declarant's personal knowledge was based on a "review of the records").

> Personal knowledge . . . is not strictly limited to activities in which the declarant has personally participated. . . . [P]ersonal knowledge can come from the review of the contents of files and records. Based on personal knowledge of the files and records, a declarant may testify to the acts that she or he did not personally observe but which are described in the record, including requests or statements by third persons made to someone other than the declarant.

*Washington Cent. R.R. Co. v. Nat'l Mediation Bd.*, 830 F. Supp. 1343, 1353 (E.D. Wash. 1993) (citations omitted); *see also Khodara Envtl. II, Inc. v. Chest Twp.*, 2007 WL 3146745, at *1 (W.D. Pa. Oct. 26, 2007) ("[P]ersonal knowledge of a matter included in an affidavit under Rule 56(e) may be based not only upon knowledge gained through one's sensory perceptions, but through a review of records of the matter in question.").

Upon review of the challenged declarations, the Court finds that each is clearly based on the personal knowledge of the declarant. Indeed, notwithstanding a boilerplate reference to a "review[] [of] the medical records", (Dobushak Decl. ¶ 3), and "review[] [of] my files", (Washington Decl. ¶ 7; Fuga Decl. ¶ 5), all appear to be based on the personal

18

observations or experience of the declarants. Additionally, the personal knowledge of the declarants also encompasses knowledge gained through the review of records. Saldana thus requests exclusion of these three declarations because he asserts they are based on inadmissible records. Rule 803(6) creates a hearsay exception for business records that: (1) were made at or near the time of the event the record describes; (2) were made by a person with knowledge of the record's contents; and, (3) were kept in the regular course of business. FED. R. EVID. 803(6). Rule 803(6) further provides that the above prerequisites may be established by the testimony of a record custodian, either in person or by sworn declaration. *Id.* Defendants Washington and Fuga submitted their declarations under penalty of perjury and declared that the records submitted are true and correct copies of records kept in the ordinary course of business by the BOP. (Washington Decl. p. 2; Fuga Decl. p. 2). Dr. Dobushak certified that the records submitted are true and correct copies of records regularly maintained by the BOP, were created at or near the time of the event the record describes by someone with knowledge, and Dr. Dobushak specifically stated that he is "qualified to execute this certification pursuant to FED. R. EVID. 803(6) and 902(11)." (Dobushak Decl. p. 5). Consequently, the Court will consider these declarations in deciding the summary judgment motion.

Additionally, Saldana asserts that Defendants submitted an unsworn declaration of Dr. Dobushak in support of their motion for summary judgment. In his declaration, Dr.

19

Dobushak certified that, at all relevant times, he was employed by the BOP as the Clinical Director for USP-Canaan and was the custodian of the documents and medical records maintained by the BOP. (Dobushak Decl. ¶ 1; Dobushak Decl. p. 5). As stated, Dr. Dobushak certified that he "is qualified to execute this certification pursuant to FED. R. EVID. 803(6) and 902(11))." (Dobushak Decl. p. 5). Dr. Dobushak's declaration is based on his personal experience with Saldana, his personal review of indisputably authentic BOP medical records, and his certified role as custodian of institutionally maintained files and records.

Accordingly, Saldana's objection to consideration of the declarations of Defendants Dobushak, Washington, and Fuga will be overruled.

## B.  *Bivens* Claim

A *Bivens* action is the federal counterpart to an action filed under 42 U.S.C. § 1983. *See Paton v. LaPrade*, 524 F.2d 82 (3d Cir. 1975); *Farmer v. Carlson*, 685 F. Supp. 1335, 1338 (M.D. Pa. 1988). Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for

redress. . . .

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## 1. *Personal Involvement*

Defendants argue that Saldana fails to state a claim against Washington and Fuga because they lack personal involvement in the alleged wrongs, and there are no factual allegations against them establishing their personal involvement. (Doc. 26 at 13-14). The Court agrees.

Individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207-08; *see also Rizzo v. Goode*, 423 U.S. 362 (1976); *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must

be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode,* 845 F.2d at 1208.

In a conclusory fashion, Saldana asserts that: "Both officers Fuga, Washington, and the other unknow[n] staff members were aware of the facts which the inference could be drawn that a substantial harm existed and that either drew that inference." (Doc. 2, p. 20). He appears to sue Washington and Fuga based on their employment in USP-Canaan's Safety Department. (*Id.* at p. 17). Saldana fails to establish the personal involvement of these Defendants. Instead, Saldana asserts that their personal involvement is "*based on Plaintiff[']s allegations* that Defendants were responsible for assuring the walkway was maintained and properly repair[ed] to avoid injury to the inmate population at USP Canaan, and obtained personal knowledge of a substantial risk of harm as a result of the alleged unrepai[r]ed sidewalk and potholes." (Doc. 46, p. 20) (emphasis added). He further asserts that Defendants Washington and Fuga "knew or should have known that the sidewalk and potholes could injure somebody." (*Id.*). In their sworn declarations, Washington and Fuga attest that they never received any complaints by any inmates at USP-Canaan about a defect in the walkway near the F Housing unit, they never purposefully ignored any defect in

22

the walkways at USP-Canaan, and they do not recall Saldana ever sustaining or reporting

an injury to his right foot as a result of a defect in a walkway at USP-Canaan. (Washington

Decl. ¶¶ 7-9; Fuga Decl. ¶¶ 5, 8, 9). Furthermore, the record reflects that Saldana was

treated by the medical department several times between June 13, 2014, the date of the

alleged fall, and June 23, 2014, the date he reported the alleged fall to staff. (See Doc. 27-

1, pp. 108-111, Clinical Encounter note dated June 13, 2014; Doc. 27-1, pp. 102-106,

Clinical Encounter notes dated June 15, 2014 and June 16, 2014; Doc. 27-1, pp. 97-101,

Clinical Encounter note dated June 17, 2014; Doc. 27-1, pp. 90-94, Clinical Encounter note

dated June 23, 2014). During these clinical encounters, Saldana never reported a right foot

injury or fall. (See id.). Saldana has provided no evidence to dispute these facts. A party

opposing summary judgment must come forth with "affirmative evidence, beyond the

allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331

F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e). Saldana cannot survive Rule

56 scrutiny by relying on unsupported assertions, conclusory allegations, or mere

suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (the party

adverse to summary judgment must raise "more than a mere scintilla of evidence in its

favor"). Saldana has failed to meet his burden with respect to this claim.

Consequently, Defendants Washington and Fuga are entitled to an entry of judgment

in their favor based on their lack of personal involvement in the alleged denial of Saldana's

constitutional rights.

## 2. Exhaustion of the Deliberate Indifference Claim[5]

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required

to pursue all avenues of relief available within the prison's grievance system before bringing

a federal civil rights action concerning prison conditions. *See* 42 U.S.C. § 1997e(a); *Booth*

*v. Churner*, 206 F.3d 289, 291 (3d Cir. 2000). Section 1997e(a) establishes the

requirement of administrative exhaustion:

> No action shall be brought with respect to prison conditions under section
> 1983 of this title, or any other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such administrative remedies as are
> available are exhausted.

42 U.S.C. § 1997e(a). Saldana's *Bivens* claim falls within the ambit of the PLRA. *See*

*Nyhuis v. Reno*, 204 F.3d 65, 68 (3d Cir. 2000) ("[Section] 1997e(a) applies equally to §

1983 actions and to *Bivens* actions.").

The PLRA "exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It has

been made clear that the exhaustion requirement is mandatory. *See Williams v. Beard*, 482

F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding

---

[5] The exhaustion procedures for BOP *Bivens* claims differ from those of the FTCA. Exhaustion for *Bivens* purposes requires completion of the BOP's Administrative Remedy Program, whereas the exhaustion procedures for administrative tort claims are set forth in the Federal Tort Claims Act.

that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis*, 204 F.3d at 67 (same). "[I]t is beyond the power of [any] court . . . to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73 (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)). To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. *Spruill*, 372 F.3d at 227-32; *see also Nyhuis*, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. *Spruill*, 372 F.3d at 227-32; *see also Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000).

For federal prisoners, such as Saldana, the BOP has an administrative remedy procedure setting forth the necessary steps to exhaust a grievance pursuant to § 1997e(a). 28 C.F.R. § 542.10(a). Specifically, the BOP has a three-level administrative process through which an inmate can address issues concerning the conditions of his confinement. *See id.* An inmate must first informally present his complaint to staff, and staff is to attempt to resolve the matter. 28 C.F.R. § 542.13(a). If the informal resolution is unsuccessful, then the inmate must execute the appropriate form to bring the matter to the attention of the

25

warden, within twenty calendar days of the date of the incident. 28 C.F.R. § 542.14(a). If the inmate is dissatisfied with the warden's response, he may then appeal to the Regional Director within twenty calendar days. 28 C.F.R. § 542.15(a). The inmate may then appeal to the BOP's Central Office within thirty calendar days, which office is the final administrative appeal level in the BOP. *Id.* No administrative appeal is considered to have been fully exhausted until considered by the BOP's General Counsel. 28 C.F.R. § 542.15(a). If an administrative remedy is rejected for a procedural deficiency, the remedy is returned to the inmate and the BOP provides the inmate with a written notice explaining the reason for the rejection. 28 C.F.R. § 541.17(b).

According to BOP records, Saldana successfully exhausted all available administrative remedies concerning his claim that he was denied medication initially prescribed at an outside hospital following his June 23, 2014 evaluation. (Doc. 27, Administrative Remedy Generalized Retrieval, pp. 15-18, 20). Defendants concede that Saldana properly exhausted this claim. (Doc. 27, p. 16). However, Defendants contend that Saldana did not file any administrative remedies related to his allegation that Defendants Washington and Fuga failed to correct a defect in the facility sidewalk. (*Id.*). The evidence reflects that Saldana fully exhausted his claim that he was injured when he allegedly fell on a defective sidewalk on June 13, 2014. (Doc. 47, pp. 1-11, Administrative Remedy Number 785608).

Saldana claims that a prison counselor attempted to obstruct his ability to exhaust his administrative remedies regarding this claim by giving him incorrect advice and misleading information. (Doc. 46, p. 24). Saldana asserts that, despite the actions of this counselor, he was nevertheless able to fully exhaust this claim. (*Id.*). Courts have invariably held that affirmative misconduct by prison officials, designed to impede or prevent an inmate's attempts to exhaust, may render administrative remedies unavailable. *See Todd v. Benning*, 173 F. App'x 980, 982-83 (3d Cir. 2006) (expressing approval of the Eighth Circuit's holding in *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) that administrative remedies were not available where prison officials "purportedly prevented prisoner from employing the prison's grievance system"). Examples of affirmative misconduct on the part of prison officials include: (1) threatening a prisoner in an attempt to thwart the prisoner's attempts to exhaust, *see Harcum v. Shaffer*, 2007 WL 4167161, at *5 (E.D. Pa. 2007) (finding administrative remedies unavailable where prison officials threatened plaintiff with "opposition to his future prerelease application, parole, or outside work detail if he did not withdraw his grievance"), (2) refusing to provide appropriate grievance forms in response to inmate inquiries, *see Mitchell v. Horn*, 318 F3d 523, 529 (3d Cir. 2003), (3) advising an inmate that his or her situation does not require a grievance, *see Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (finding that administrative remedies were unavailable to plaintiff who had been advised by prison official that he must wait until the end of the prison's

investigation before filing a grievance), and (4) failing to file or respond to a prisoner's

grievances, *see Camp*, 219 F.3d at 280-81 (finding that administrative remedies were

unavailable where prison officials refused to file plaintiff's grievances regarding their

coworkers). The evidence reflects that, even if Saldana's attempts to exhaust this claim

were thwarted by prison officials, he has exhausted his claim that was injured when he fell

on a defect in the facility sidewalk. Consequently, the motion for summary judgment will be

denied on this ground.

### 3. *Deliberate Indifference Claim against Dr. Dobushak*

Defendants next argue that Saldana failed to establish a deliberate indifference claim

against Dr. Dobushak. (Doc. 26, pp. 17-23). The Eighth Amendment's proscription against

cruel and unusual punishment requires that prison officials provide inmates with adequate

medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). In order to establish an

Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii)

acts or omissions by prison officials that indicate deliberate indifference to that need."

*Natale v. Camden Cty. Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse

v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been

diagnosed by a physician as requiring treatment or one that is so obvious that a lay person

would recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional

Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and

28

wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Smart v. Villar*, 547 F.2d 112, 113 (10th Cir. 1976), *cert. denied*, 450 U.S. 1041 (1981).

Saldana alleges that Dr. Dobushak did not provide him the antibiotic initially prescribed at a local hospital. (Doc. 2, pp. 3, 4, 9, 10, 14). As a result, Saldana alleges that Dr. Dobushak "prevented him from receiving his medications that caused him to get re-infected, get M[R]SA, osteomyelitis, and the amputation of his right fifth toe." (Doc. 2, p. 14). The Rule 56 record demonstrates that Saldana received ample medical attention from Defendant Dr. Dobushak and that he was not deliberately indifferent to his needs.

29

During an evaluation on May 17, 2013, it was noted that Saldana's diabetes was grossly uncontrolled, he wasn't taking his insulin as prescribed, and his chronic Type II diabetes had worsened. (SMF ¶¶ 6, 7; Doc. 27-1, pp. 160-67, Clinical Encounter dated May 17, 2013). The voluminous medical records reflect that Saldana's diabetes and insulin levels were continually monitored by the HSD during his incarceration at USP-Canaan. (Doc. 27-1, pp. 48-171, Clinical Encounter notes).

On September 13, 2013, Saldana's right foot was examined by the HSD for a three-month follow-up for his diabetic foot. (SMF ¶ 9).

On May 14, 2014, Saldana was seen by the HSD for an injury to his right foot that he had sustained two days prior to this evaluation. (Doc. 27-1, pp. 126-29, Clinical Encounter note dated May 14, 2014). It was noted that the lesion was located on the fifth metatarsal area of the right foot. (Doc. 27-1, p. 127). The wound was cleaned and drained, and a referral to podiatry was ordered. (Id.). Saldana was provided a prescription for Cephalexin and directed to follow up with the HSD if his condition worsened. (Id.).

On June 3, 2014, Saldana reported to the HSD to receive wound care. (Doc. 27-1, pp. 123-24, Clinical Encounter note dated June 3, 2014). It was noted that Saldana had an open ulceration to the bottom of his right foot. (Id.). The wound was cleaned, sterilized, and appropriately dressed, and Saldana was referred to podiatry. (Id.). On June 5, 2014, a podiatrist treated Saldana. (Doc. 27-1, pp. 120-21, Clinical Encounter note dated June 5,

2014). Saldana was diagnosed with an ulceration of the right fifth metatarsal with fibrous

clot center, deep into the subcutaneous tissue/deep fascia. (Id.). The podiatrist prescribed

Levofloxacin, provided ointment to apply to the wound, and ordered further testing. (Id.).

On June 8, 2014, Saldana presented to the HSD for treatment of his persistent

wound on the right foot, and he was ultimately transferred to a local hospital for further

evaluation. (Doc. 27-1, pp. 117-19, Clinical Encounter note dated June 8, 2014). Saldana

returned to USP-Canaan on June 9, 2014 and was treated by the HSD for a follow-up

evaluation. (Doc. 27-1, pp. 112-16, Clinical Encounter note dated June 9, 2014). Saldana

reported that the local hospital told him there was nothing wrong, and did not issue any new

orders. (Doc. 27-1, p. 112).

On June 13, 2014, the HSD was informed by the local hospital that Saldana tested

positive for Staph Haemolyticus. (Doc. 27-1, pp. 108-111, Clinical Encounter note dated

June 13, 2014). It was noted that Saldana had a right foot ulcer at the base of the fifth digit.

(Doc. 27-1, p. 108). It was also noted that Saldana's antibiotics would be changed due to

his sensitivities. (Id.). The medication change was discussed with Saldana, and he agreed

to the change. (Id.). Saldana was directed to report back to the HSD daily for his dressings

to be changed. (Id.).

On June 15 and 16, 2014, Saldana was again treated by the HSD for his right foot

ulcer. (Doc. 27-1, pp. 102-106, Clinical Encounter notes dated June 15, 2014 and June 16,

2014). On June 16, 2014, Saldana reported that his right foot was a little better than the previous days. (Doc. 27-1, p. 102).

On June 17, 2014, Saldana's condition worsened and he was again transferred to the local hospital. (Doc. 27-1, pp. 97-101, Clinical Encounter note dated June 17, 2014). The local hospital provided intravenous antibiotics to Saldana, his wound began to improve, and he was returned to USP-Canaan on June 23, 2014. (Doc. 27-1, pp. 90-94, Clinical Encounter note dated June 23, 2014). Saldana received daily dressing changes, wound care follow-up and consultations with podiatry to treat his wound. (Doc. 27-1, pp. 67-94, Clinical Encounter notes).

On July 28, 2014, it was noted in Saldana's medical record that he had poorly controlled his Type II diabetes and developed a non-healing persistent diabetic right foot ulcer. (Doc. 27-1, pp. 75-76, Clinical Encounter note dated July 28, 2014). It was further noted that Saldana had been seen by podiatry regularly, had undergone numerous debridement's in the area of the wound, and was also prescribed numerous medications to treat the wound. (Id.).

On July 29, 2014, Saldana was again transferred to the local hospital and remained there until his transfer to Springfield Medical Center. (Doc. 27-1, pp. 67-68, Clinical Encounter note dated July 29, 2014; SMF ¶ 44).

On August 1, 2014, Saldana's fifth toe on his right foot was amputated due to

32

osteomyelitis. (Doc. 27-1, p. 65, Clinical Encounter note dated August 1, 2014).

The record reflects that Saldana was regularly treated and evaluated for his right foot condition. The record further reflects that, based on his medical opinion, Dr. Dobushak changed the antibiotic prescribed at the local hospital because he believed it would offer no benefit to Saldana and could possibly cause additional symptoms or harm. (SMF ¶¶ 49-51; Dobushak Decl. 19).

Claims of medical malpractice and disagreements as to the proper course of medical treatment simply do not suffice to satisfy the deliberate indifference standard. *See Monmouth Cty.*, 834 F.2d at 346. Courts will not second guess whether a particular course of treatment is adequate or proper. *See Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)). This is not a situation where Saldana is asserting that he was not provided with any medical attention or that needed care was delayed. Despite all of the medical treatment he received, Saldana appears to disagree with the treatment provided to him. Indeed, Saldana's main contention in support of his claim against Dr. Dobushak appears to be that he failed to provide him the antibiotic initially prescribed at a local hospital. (Doc. 2, pp. 3, 4, 9, 10, 14). However, neither a misdiagnosis nor a disagreement with a doctor's chosen course of medical treatment state a claim of deliberate indifference. A long line of precedent establishes that the "mere disagreement as to the proper medical treatment"

does not amount to a constitutionally cognizable claim. *See Spruill*, 372 F.3d at 235 (citing

*Monmouth Cty.*, 834 F.2d at 346); *see also Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir.

1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care

that was given will not support an Eighth Amendment claim."); *Wright v. Collins*, 766 F.2d

841, 849 (4th Cir. 1985) (stating that a prisoner's disagreement with a treatment plan does

not constitute deliberate indifference unless exceptional circumstances are alleged) (citing

*Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *Wester v. Jones*, 554 F.2d 1285,

1286 (4th Cir.1977) (*per curiam*); *Baylis v. Taylor*, 475 F.Supp.2d 484, 489 (D. Del. 2007)

(holding that prisoner failed to state a § 1983 claim for deliberate indifference to serious

medical needs where he alleged that doctor stopped prescribing a particular medication

prisoner deemed appropriate for treatment of his attention deficit disorder); *Gause v.*

*Diguglielmo*, 339 F. App'x 132, 136 (3d Cir. 2009) (a dispute over the choice of medication

does not rise to the level of an Eighth Amendment violation).

The deliberate indifference standard is a stringent standard of fault requiring proof

that a defendant disregarded a known or obvious consequence of his action. *Bd. of Cnty.*

*Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). Here, there is no evidence

capable of establishing that it was known or obvious to Dr. Dobushak that his proffered

treatment would cause Saldana continued pain. Though Saldana may have preferred a

different medication, such disagreement is not enough to state a § 1983 claim. This is

particularly true in light of the fact that there are no claims that Defendant Dr. Dobushak intentionally withheld medical treatment from Saldana in order to inflict pain or harm upon him. See Farmer, 685 F. Supp. at 1339; Rouse, 182 F.3d at 197. Therefore, there is no genuine issue of material fact with respect to Saldana's deliberate indifference claim against Dr. Dobushak, and the Court will grant summary judgment in favor of Defendant Dr. Dobushak.

### 4. Qualified Immunity

Defendants invoke the defense of qualified immunity as to the claims against Washington and Fuga. (Doc. 26, pp. 34-37). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp, 669 F.3d at 159 (citing Pearson, 555

U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first). Because there are no genuine issues of fact as to whether a constitutional right has been violated, Defendants Washington and Fuga are protected from liability by qualified immunity.

### C.   FTCA Claim

#### 1.   *Negligence Claim against Washington and Fuga*

Defendants contend that Saldana failed to show that the injury to his right foot was because of the negligence of Washington and Fuga. (Doc. 26, pp. 23-27). Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and its liability "is generally determined by reference to state law." *Molzof v. United States*, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992). A claim brought under the FTCA is governed by "the

law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Accordingly,

Pennsylvania law governs Saldana's claims. *See DeJesus v. U.S. Dep't of Veterans*

*Affairs*, 479 F.3d 271, 279 (3d Cir. 2007). To demonstrate a *prima facie* case of negligence

under Pennsylvania law, a plaintiff must show that: (1) the defendant owed a duty of care to

the plaintiff; (2) the defendant breached that duty; (3) there is a causal connection between

the breach and the resulting injury; and (4) the plaintiff suffered actual loss or damage. *See*

*Krentz v. Consolidated Rail Corp.*, 589 Pa. 576, 910 A.2d 20, 27 (Pa. 2006).

The Bureau of Prisons "must exercise ordinary diligence in keeping prisoners safe

and free from harm." *Fiore v. Holt*, 435 F. App'x 63, 66 (3d Cir. 2011); *see also* 18 U.S.C. §

4042 (prison officials have a duty of "ordinary diligence to keep prisoners safe from harm").

Pennsylvania law recognizes inmates as invitees. *See Graf v. Cnty. of Northampton*, 654

A.2d 131, 134 (Pa. Cmwlth. Ct.1995). Therefore, Saldana must show that staff at USP-

Canaan: (1) knew of the alleged defect in the walkway around housing unit F or would have

discovered it by the exercise of reasonable care, and should have realized that it posed an

unreasonable risk of harm; (2) should have expected that Saldana would not discover the

danger or would have failed to protect himself against it; and (3) failed to exercise

reasonable care to protect Saldana from the danger. *See Carrender v. Fitterer*, 503 Pa.

178, 469 A.2d 120, 123 (1983). Additionally, Saldana must prove that staff at USP-Canaan

staff "had a hand in creating the harmful condition, or [] had actual or constructive notice of

37

such condition." *Estate of Swift v. Ne. Hosp. of Phila.*, 456 Pa. Super. 330, 690 A.2d 719, 722 (1997).

Saldana failed to provide any evidence that he gave notice to Defendants of the purported defect in the walkway. Additionally, he has not provided any evidence that Defendants were aware of the alleged defect in the walkway and failed to correct it, nor that they had a hand in creating it or had actual or constructive notice of the condition. Saldana also offered no evidence that the alleged dangerous condition was not subject to ready detection and avoidance by a reasonably prudent person. Saldana's own declaration shows that not only was the broken sidewalk obvious to a reasonably attentive invitee, but also that he was aware of the broken sidewalk with potholes. (Doc. 46, p. 16, ¶ 8).

Furthermore, Saldana acknowledges that he had "no knowledge" of when his injury initially occurred. (Doc. 2, p. 14; Doc. 47, p. 16, ¶¶ 6, 7). Instead, Saldana states that he was unaware that he even sustained a fracture to his right foot until the x-ray revealed a fracture. (Doc. 47, p. 16, ¶ 6). The record reflects that Saldana was treated by the medical department several times between June 13, 2014, the date of the alleged fall, and June 23, 2014, the date he reported the alleged fall to staff. Saldana never reported a right foot injury or fall during any of these clinical encounters. Without knowing when the injury occurred, it would certainly be difficult for Saldana to prove that the injury occurred when he allegedly encountered the dangerous sidewalk.

Viewing the complaint and all the evidence in Saldana's favor, there is insufficient evidence in the record upon which a jury could conclude that Defendants Washington and Fuga knew, or should have known, about the condition or failed to do anything about it. Consequently, the motion for summary judgment will be granted on this ground.

## 2.   *Negligence Claim against Dr. Dobushak*

As stated, in an FTCA action, the district court applies the law of the state in which the act occurred. *See* 28 U.S.C. § 1346(b); *Castillo v. United States*, 2002 WL 1752235, at *3 (7th Cir. 2002). Under Pennsylvania law, a plaintiff is required to show, by a preponderance of the evidence, that the defendant's negligence was the proximate cause of his injury. *Baum v. United States*, 541 F.Supp. 1349, 1351 (M.D. Pa. 1982). In order prevail on a medical malpractice/negligence claim under Pennsylvania law, a plaintiff has the burden of establishing each of the following elements: (1) that there was a duty owed by the physician; (2) that there was a breach of that duty; (3) that the breach proximately caused the harm experienced by the plaintiff; and (4) that the plaintiff's damages directly resulted from the harm. *See Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 907 A.2d 1061, 1070 (Pa. 2006) (quoting *Hightower-Warren v. Silk*, 548 Pa. 459, 698 A.2d 52, 54 (Pa. 1997)); *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (Pa. 1990). In addition, a plaintiff must present expert opinion attesting "to a reasonable degree of medical certainty," that the act of the physician or medical personnel "deviated from accepted

medical standards, and that such deviation was the proximate cause of the harm suffered."

*Hakeem v. Salaam*, 260 F. App'x 432, 434 (3d Cir. 2008) (citing *Mitzelfelt*, 584 A.2d at 892).

*See also Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003) (holding that because the

negligence of a physician encompasses matters not within the ordinary knowledge and

experience of laypersons a medical malpractice plaintiff must present expert testimony to

establish a prima facie case of medical malpractice); *Gindraw v. Dendler*, 967 F.Supp. 833,

837 (E.D. Pa.1997); *Hoffman v. Brandywine Hosp.*, 443 Pa.Super. 245, 661 A.2d 397, 399-

400 (Pa. Super. Ct.1995). The only exception to this requirement is when a matter "is so

simple, and the lack of skill or want of care so obvious, as to be within the range of

experience and comprehension of even nonprofessional persons." *Toogood*, 824 A.2d at

1145 n. 14 (citing *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794, 796 (Pa.1970));

*Hightower-Warren*, 698 A.2d at 54 n. 1. This "very narrow exception" is implicated only in

instances of *res ipsa loquitur*. *Toogood*, 824 A.2d at 1145.

Defendants argue that Saldana failed to provide the requisite expert testimony

necessary to establish his *prima facie* case of medical negligence. (Doc. 26, p. 30).

Defendants contend that Saldana acknowledges that he has no factual support for his

allegations that Dr. Dobushak was negligent, and therefore raises the doctrine of *res ipsa*

*loquitur*. (*Id.*). Saldana states as follows:

> [A] tort victim can prevail in a negligence action without direct evidence of the
> defendant's negligence. It allows the plaintiff to satisfy his burden of

producing evidence of defendant's negligence by showing that the injury is the sort that normally would not occur in the absence of defendant's negligence.

(Doc. 2, p. 20).

As noted, the narrow exception to the requirement of expert testimony in medical malpractice actions occurs in cases of *res ipsa loquitur.* "It is a rule that provides that a plaintiff may satisfy his burden of producing evidence of a defendant's negligence by proving that he has been injured by a casualty that normally would not have occurred in the absence of the defendant's negligence." *Quinby*, 907 A.2d at 1071. However, it is well-settled that reliance of the doctrine of *res ipsa loquitur* in medical negligence cases "must be carefully limited," and, pursuant to the Restatement (Second) of Torts § 328D[6], "three conditions must be met before the doctrine of *res ipsa loquitur* may be invoked: (a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and

---

[6]    Pennsylvania has adopted *res ipsa loquitur* as stated in the Restatement (Second) of Torts § 328D. *See Quinby*, 907 A.2d at 1071. Under § 328D, it may be inferred that the harm suffered was caused by the negligence of the defendant when: (1) the event is the kind which does not ordinarily occur in the absence of negligence; (2) the evidence sufficiently eliminates other possible causes, including the conduct of the plaintiff and third parties; and (3) the indicated negligence is within the scope of the defendant's duty to the plaintiff. Restatement (Second) of Torts § 328D, *Res Ipsa Loquitur.*

41

complete explanation of the event." *Toogood*, 824 A.2d at 1149-50. Before a plaintiff can invoke the doctrine of *res ipsa loquitur*, all three elements must be met to give rise to an inference of negligence. *See Toogood*, 824 A.2d at 1149-50 (holding that before *res ipsa loquitur* may be invoked, plaintiffs must meet the three § 328D conditions). After all three elements have been established, if reasonable persons may reach different conclusions regarding the negligence of the defendant, then it is for the jury to determine if the inference of negligence should be drawn. *Id.*; *see also Leone v. Thomas*, 630 A.2d 900, 901 (Pa. Super. Ct. 1993). However, "if there is any other cause to which with equal fairness the injury may be attributed (and a jury will not be permitted to guess which condition caused the injury), an inference of negligence will not be permitted to be drawn against defendant." *MacNutt v. Temple University Hosp., Inc.*, 932 A.2d 980, 987 (Pa. Super. Ct. 2007) (quoting *Fredericks v. Atlanta Refining Co.*, 127 A. 615, 617 (1925)).

It simply cannot be said that an individual could not suffer the symptoms that Saldana alleges he suffered in the absence of someone's negligence. For example, the symptoms related to Saldana's foot could occur in an individual with a long history of uncontrolled diabetes. Indeed, Defendants aver that Saldana's diabetes likely contributed to the medical issues related to his foot. (Doc. 26, p. 32). There is substantial evidence in the record to suggest that Saldana's injury is consistent with an individual with a long history of uncontrolled diabetes. The medical issues presented in this case are clearly not so

42

"simple" as to be within a layperson's "range of experience and comprehension." *Toogood*, 824 A.2d at 1145. Thus, Saldana is unable to demonstrate an inference of negligence on the part of Defendant Dr. Dobushak in order to fall within the "very narrow exception" to the general rule requiring expert testimony for professional negligence claims. *Id.* Without expert testimony, Saldana cannot demonstrate liability on the part of Defendant Dr. Dobushak for failing to provide the antibiotics he received at the local hospital. Accordingly, the Court finds the doctrine of *res ipsa loquitur* to be inapplicable in this case and will grant Defendant's motion for summary judgment accordingly.

## IV. Conclusion

For the reasons set forth above, Defendants' motion (Doc. 20) for summary judgment will be granted. A separate Order shall issue.

Dated: March /9 , 2018

Robert D. Mariani
United States District Judge